IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KARON EAST, | ) | |
| | ) | CASE NO. 1:13-CV-1479 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 16). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Karon East's ("Plaintiff" or "East") application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*, is supported by substantial evidence and, therefore, conclusive.  For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

East filed an application for Supplemental Security Income benefits on November 20, 2009. (Tr. 76, 137-43).  Plaintiff alleged she became disabled on February 1, 2001 due to suffering from depression, post-traumatic stress disorder ("PTSD"), paranoid personality disorder, anxiety, asthma, gastroesophageal reflux disease ("GERD"), degenerative disc disease, chest pain, hiatal hernia, and a metal rod in her left leg. (Tr. 167).  The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 78-80, 88-90).

At Plaintiff's request, administrative law judge ("ALJ") Valencia Jarvis convened an administrative hearing on January 9, 2012 to evaluate her application. (Tr. 29-75).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), Robert Mosley, also appeared and testified. (*Id.*).

On February 22, 2012, the ALJ issued an unfavorable decision, finding East was not disabled. (Tr. 12-23).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 8).  The Appeals Council denied the request for review, making the ALJ's February

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

22, 2012 determination the final decision of the Commissioner. (Tr. 1-5).  Plaintiff now seeks

judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 1383(c)(3).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on April 27, 1961, and was 50 years old on the date the ALJ rendered

her decision (Tr. 34-35), making Plaintiff a "person closely approaching advanced age" for

Social Security purposes. 20 C.F.R. § 416.963(d).  She has no past relevant work. (Tr. 21).

Plaintiff was released from prison in November 2009, after being incarcerated for

approximately 18 years. (Tr. 309).  During her incarceration, East obtained her GED (Tr. 50,

485), took a computer class that she enjoyed (Tr. 283), completed building maintenance

vocational training (Tr. 174), and worked as a sewing machine operator. (Tr. 159).  After her

release, Plaintiff lived in a housing program for ex-offenders that required her to attend

community college classes as a condition of residence. (Tr. 52, 58-59).  Plaintiff testified that she

was working towards an associate's degree, and her grades generally ranged from "As" to "Ds."

(Tr. 59-60).

### B.  Mental Impairments

While Plaintiff was incarcerated, she received treatment for depression, PTSD, and

paranoid personality disorder. (Tr. 254-60).  Despite nightmares, depression, and other

symptoms, East enjoyed reading and writing. (Tr. 282).

On November 30, 2009, the day of Plaintiff's release from prison, psychological assistant

Jamie Bealty, PCC, completed a psychological evaluation. (Tr. 322-23).  Plaintiff was assigned

to Ms. Bealty's caseload for almost the entire ten year period for which Ms. Bealty had been

employed with the prison. (Tr. 323).  Ms. Bealty opined that East's prognosis was "excellent,"

though her anxiety and fear of misunderstanding may be exhibited in a work situation.  (Tr. 322).

She also identified that East may struggle with comprehension, stress, resentment, and

misinterpreting other's communications or actions. (*Id.*).  Nonetheless, Ms. Bealty explained that

Plaintiff showed "an enthusiasm for learning and was like a sponge for information.  She spent

her spare time in the library." (Tr. 323).  Ms. Bealty recommended that East complete some

courses in basic English and communication, but she was naturally an effective communicator

and usually very direct.  Plaintiff had experienced some chronic anxiety in interpersonal

situations, as well as many years of trauma causing mistrust of others, and would benefit from

therapy and continued medication.  However, Ms. Bealty indicated that as East's confidence in

verbal and social skills increased, she would perform well in a field that required customer

contact and interaction. East was also a self-taught typist, which Ms. Bealty indicated was an

accomplishment, given the circumstances of her incarceration. (*Id.*).

On December 14, 2009, Plaintiff presented to MetroHealth Re-Entry Clinic

("MetroHealth"). (Tr. 309).  East reported that she had many roommates while in prison, because

she panicked when people were close to her and became overwhelmed. (Tr. 310).  Plaintiff also

described symptoms of poor sleep, panic attacks, depression, social isolation, and poor self-

esteem. (*Id.*).  Angela Gannon, M.D., performed a mental status examination. (Tr. 312).  Plaintiff

appeared well groomed; was cooperative and calm; and had clear, normal speech.  East's thought

process was logical and organized.  Dr. Gannon observed no abnormal or psychotic thoughts,

and Plaintiff denied suicidal or homicidal thoughts. East's judgment, insight, memory, and

attention were all good.  However, she appeared depressed, overwhelmed, and on the verge of

tears. (*Id.*).  Dr. Gannon diagnosed depressive disorder and adjusted Plaintiff's medications,

discontinuing Buspar and Vistaril, prescribing Seroquel, and continuing Wellbutrin. (Tr. 313).

On January 11, 2010, Plaintiff returned to MetroHealth and reported compelling thoughts of jumping from high places or out of a vehicle, but explained that these thoughts occurred only when she was in such locations. (Tr. 297).  Despite this issue, Plaintiff was cooperative, logical, had good insight, and showed no evidence of perceptual disturbance. (Tr. 297-98).  East had a flat affect, appeared anxious, and had paranoid thoughts about being around others. (*Id.*).  Dr. Gannon continued Plaintiff's prior course of psychotropic medication. (Tr. 298).  In a letter dated January 26, 2010, Dr. Gannon opined that it was not appropriate for East to work due to her untreated, severe anxiety, panic attacks, and post-traumatic stress resulting from abuse and neglect as a child. (Tr. 463).

On February 11, 2010, Plaintiff presented for an initial psychiatric evaluation with Brenda Altose, M.D., of Mental Health Services, Inc. (Tr. 438).  Plaintiff complained of racing thoughts, anxiety, depression, and difficulty making friends. (*Id.*).  Upon examination, Plaintiff was engaged, but had pressured and rapid speech; mild paranoia; an anxious mood; and a fair memory. (Tr. 439).  Dr. Altose adjusted Plaintiff's medications. (*Id.*).

On March 1, 2010, state agency physician David Dietz, Ph.D., completed a review of the record. (Tr. 330-46).  He opined that Plaintiff did not meet the requirements for Listing 12.04, and was moderately restricted in activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. 333, 340).  Dr. Dietz concluded that Plaintiff could understand, remember, and carry out simple, repetitive tasks in a relaxed stetting. (Tr. 346).  She could have occasional and superficial interactions with others, but should avoid contact with the public.  Dr. Dietz opined that East should not be expected to handle frequent changes, frequent conflict, or fast-paced production demands. (*Id.*).

On March 1, 2010, Richard Litwin, Ph.D., conducted a neuropsychological evaluation at the request of the Bureau of Vocational Rehabilitation ("BVR"). (218-22, 457-61). East reported a series of prior head injuries, serious memory decline, and trouble focusing. (Tr. 218). Based on East's score on the Wechsler Adult Intelligence Scale 3 test, Dr. Litwin opined that intellectually, East had mild mental retardation. (Tr. 219). Her aptitude scores for language fell between the third and sixth grade levels, which Dr. Litwin explained was expected for her IQ, and there was not strong evidence of an underlying learning disability. (*Id.*). In terms of memory, testing showed that East had significant memory deficits, which were not fully explained by her low IQ. (Tr. 220). Her ability to learn new information with repetition was very limited. (*Id.*). Dr. Litwin diagnosed major depressive disorder, PTSD, anxiety disorder, cognitive disorder, and mild mental retardation. (Tr. 221). He opined that East's interpersonal skills were poor due to social withdrawal, anxiety, and depression; and her social skills were undeveloped. Dr. Litwin also found that Plaintiff's self-direction skills were impaired, largely due to poor memory and intellectual weaknesses. He believed she would have trouble registering and following directions, may become confused, would be forgetful, and would have trouble initiating and implementing adequate problem solving. Additionally, her tolerance for stress or fast paced work would be poor. Concluding his report, Dr. Litwin opined that East was best suited for low-skilled tasks that mainly focused on working with her hands or body in a simple, repetitive manner. (*Id.*). The doctor also recommended avoiding a work setting where East would be around large crowds, interact with the public, and have a lot of daily change in work routine. (Tr. 222).

On March 22, 2010, Dr. Altose examined Plaintiff. (Tr. 593). The doctor observed that Plaintiff looked calmer, even though she reported that her mood was anxious. Due to Plaintiff's

history of trauma, anxiety, and mood disorder not yet optimally treated, Dr. Altose opined that it would be extremely problematic for East to work consistently in peer or social situations. (*Id.*). Dr. Altose also completed a Mental Functional Capacity Assessment form, opining that East was markedly and moderately limited in a range of work related areas. (Tr. 592).  Dr. Altose found that such limitations would last between 9 and 11 months.  She indicated that Plaintiff was unemployable. (*Id.*).

Plaintiff continued to treat at Mental Health Services from March through May 2010. (Tr. 444-48).  On May 17, 2010, Dr. Altose found that Plaintiff could work on a part-time basis. (Tr. 215).  She indicated that in a work setting, East may exhibit hyper-vigilance, anxiety, irritability with social interactions, depression, and difficulty processing or learning. (*Id.*).

In August 2010, Plaintiff returned to MetroHealth for pharmacological management after not presenting for treatment since January. (Tr. 507).  East explained that she missed prior appointments because she could not afford the bus fare and was very forgetful, but she was on her medication for most of the period for which she did not receive treatment.  Plaintiff stated that she had paranoid thoughts of someone breaking into her home or telling her to jump off of a bridge, and often saw shadows.  She appeared agitated and anxious, her attention was impaired, and her recent memory was poor.  However, her speech was spontaneous and her thoughts logical and organized. (*Id.*).  Psychiatric clinical nurse specialist Rebecca Fuller, RN, encouraged East to comply with attending appointments so that her psychiatric needs could be addressed. (Tr. 508).  Ms. Fuller opined that East was struggling with memory and dealing with life out of prison.  Plaintiff was to follow up in two weeks, but did not do so. (*Id.*).

From July 2010 to December 2010, Plaintiff was to present to Mental Health Services on a monthly basis. (Tr. 624-29).  However, she failed to attend appointments in July and

September.  While treatment notes are not entirely legible, it seems that Plaintiff continued to express depression and anxiety around August 2010. (Tr. 626).  In November 2010, Plaintiff reported she was doing "pretty good," and no longer having compulsive thoughts, although her sleep continued to be poor. (Tr. 628).  Plaintiff's mood was described as "stable." (*Id.*).

On January 3, 2011, Plaintiff presented to Catholic Charities for mental health treatment and attended four counseling sessions through April 2011. (Tr. 562-67).  Plaintiff began to open up to counselors around April regarding her past trauma and current stresses. (Tr. 565).

On March 4, 2011, Roy Szubski, LISW, performed a psychiatric evaluation of Plaintiff. (Tr. 561).  He opined that on the surface, East was practical, rational, and reasonable; however, she had strong feelings underneath and did not wish to slip back into her old ways.  Additionally, Plaintiff had good insight into current and past events, was very thoughtful, weighed information, and tried to see the positive, despite being a victim of many negative events. (*Id.*).

On March 24, 2011, Joselita Chua, M.D., of Mental Health Services performed a psychiatric assessment. (Tr. 633-34).  The same day, Dr. Chua completed a Mental Residual Functional Capacity Assessment form. (Tr. 594).  She opined that Plaintiff suffered from predominantly moderate limitations and one marked limitation, which would last between 9 and 11 months. Dr. Chua stated that Plaintiff was not employable. (*Id.*).  She observed Plaintiff was appropriately groomed, tearful, experienced hallucinations, was well-oriented, and had some difficulty with recall and concentration. (Tr. 595).

From April through December 2011, Plaintiff treated with Dr. Chua. (Tr. 634-39).  On January 5, 2012, Plaintiff returned to Catholic Charities, after not presenting for several months. (Tr. 641).  Plaintiff reported that school was very positive for her several months ago, but now

she had mixed feelings about it now.  She was living alone, and had a boyfriend for a brief period.  Plaintiff reported that she wished to attend weekly counseling and had Medicare. (*Id.*).

### C. Physical Impairments

On December 15, 2009, Julia Bruner, M.D., diagnosed Plaintiff with esophageal reflux, cervical disc disorder with radiculopathy, hyperlipidemia, mild persistent asthma, allergic rhinitis, lelomyoma of the uterus, and depression. (Tr. 317).  On December 20, 2009, Plaintiff presented to Lisa Chan, CNP, complaining of low back pain, upset stomach, sinus symptoms, and sore throat. (Tr. 300).  She noted pain in her shoulder blades, leading down her spine.  Tramadol helped her back pain some days.  Plaintiff reported difficulty obtaining medication due to financial concerns. (*Id.*).  Ms. Chan's diagnoses resembled Dr. Bruner's. (Tr. 303).

East presented to the PMR Clinic at MetroHealth on April 2, 2010 due to complaints of left upper extremity and bilateral knee pain. (Tr. 416).  Alma Garcia, D.O., recommended x-rays of the neck and knees, a trial of Lyrica for pain, and physical therapy. (Tr. 419).

On April 8, 2010, Eulogio Sioson, M.D., performed a one-time physical consultative examination of Plaintiff. (Tr. 361-65).  East reported neck, back, and joint pain since an injury in 2001 while she performed heavy lifting. (Tr. 361).  She had broken her left leg and ankle in 1991, requiring surgery, and had also broken her forearm approximately 20 years prior.  She experienced no problems with hygiene, but reported pain in the left arm and back.  Plaintiff felt that medication somewhat helped to alleviate her pain. (*Id.*).  Upon physical examination, Plaintiff walked normally, without an assistive device, and lost balance trying to heel-toe walk. (Tr. 362).  She rose from a "1/4 squat" with ankle and knee pain.  Dr. Sioson found no edema or tenderness in her extremities, and no apparent radiculopathy, deformity, or inflammatory changes in the joints.  Plaintiff reported pain with range of motion testing of the left shoulder and

9

knees.  She was able to grasp and manipulate with each hand.  Dr. Sioson concluded that Plaintiff's walking, standing, sitting, handling, carrying, and lifting would be impaired and limited to sedentary activities. (*Id.*).

East attended physical therapy with Elizabeth Musser, P.T., on April 30, 2010. (Tr. 411). Ms. Musser recommended physical therapy once a week for up to six visits. (Tr. 414).  The record does not appear to show that Plaintiff pursued physical therapy after this initial session.

On May 8, 2010, state agency reviewer William Bolz, M.D., assessed the medical record and opined that Plaintiff could perform a limited range of light work. (Tr. 371-78).  More specifically, East could lift 20 pounds occasionally and 10 pounds frequently; and sit, stand, or walk 6 hours in an 8 hour workday. (Tr. 372).  Dr. Bolz recommended postural limitations. (Tr. 373).  In his review, Dr. Bolz examined Dr. Sioson's recommendation of sedentary work, but opined that such was not supported by the results of Dr. Sioson's examination. (Tr. 377).

Plaintiff presented to Dr. Garcia at the PMR clinic on June 4, 2010, and reported neck and upper extremity pain. (Tr. 407).  Plaintiff had not obtained an electromyography ("EMG") as instructed and was non-compliant with physical therapy.  According to East, she required a prescription for physical therapy, because she was working with the BVR to find employment. An April 2010 x-ray of the cervical spine showed mild reversal of the normal cervical lordosis, and hypertrophic spondylosis, which was most evident at C5-6 and C6-7. (*Id.*).  Dr. Garcia performed a physical examination, showing a decreased cervical lordotic curvature and range of motion mildly decreased throughout the neck. (Tr. 409).  Plaintiff's neurological examination was mostly normal, with normal senses, motor strength, fine motor coordination, and gait. (*Id.*). Dr. Garcia provided a prescription for an outside physical therapy evaluation through the BVR,

encouraged Plaintiff to perform a home exercise program, and continued a prescription for Ultram and Tylenol. (Tr. 409-10).

On October 4, 2010, state agency consultative physician Leslie Green, M.D., performed a review of the updated record. (Tr. 523-31).  Dr. Green opined that Plaintiff could lift 10 pounds frequently and 20 pounds occasionally; stand, walk, and sit for 6 hours in an 8 hour day; and was limited to occasionally reaching overhead bilaterally and no overhead reaching.  East could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps, stairs, stoop, kneel, crouch, or crawl.  Due to Plaintiff's hearing loss, Dr. Green recommended a quite office setting and hearing aids.  East needed to avoid unprotected heights, commercial driving, open machinery, and situations where she would be responsible for the safety of others. (*Id.*).

From January to May 2011, Plaintiff received medical care at North Coast Ministry. (Tr. 597-606). Though East complained of pain in her legs and back, swelling, and inflammation, a treatment note from May 31, 2011, indicates that she never attended physical therapy and had not refilled her prescriptions from January 2011. (Tr. 597).

Plaintiff treated with chiropractor Adam Rutkowski, D.C., during November and December 2011, on approximately four occasions.  (Tr. 611-15).  Mr. Rutkowski recorded Plaintiff's symptoms of pain, spasms, swelling, and a restricted range of motion in the cervical spine. (Tr. 611-12).

 On December 9, 2011, Mr. Rutkowski completed a Medical Source Statement as to East's physical capacity. (Tr. 609-10).  He opined that Plaintiff could lift up to 5 pounds occasionally and 1 pound frequently; stand or walk for 1 hour in an 8 hour workday; and sit for 1 hour in an 8 hour work day. (Tr. 609). Plaintiff could rarely or never climb, balance, stoop, crouch, kneel, crawl, handle, push, pull, and perform fine manipulation or gross manipulation.

11

(Tr. 610).  However, Plaintiff could occasionally reach.  Mr. Rutkowski based these limitations on Plaintiff's low back and neck, range of motion, swelling, and spasms. He indicated that Plaintiff had been prescribed a cane and a brace, required an at-will sit-stand option, and experienced severe pain. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 20, 2009, the application date.

2. The claimant has the following severe impairments: asthma; gastroesophageal reflux disease; degenerative disc disease of the cervical spine; chronic back pain; hearing loss; obesity; depressive disorder; post-traumatic stress disorder; mild retardation; drug and alcohol abuse.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except she can lift and carry up to 10 pounds frequently, 20 pounds occasionally. She can sit, stand, and walk 6 hours of an 8-hour day.  She is limited to occasional pushing and pulling with her left upper extremity.  She is not able to perform bilateral overhead reaching using the upper extremities.  She can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds.  Stooping, kneeling, crouching, and crawling are limited to occasional.  She has to avoid concentrated exposure to extreme cold, noise, and avoid even moderate exposure to unprotected heights, commercial driving, situation[s] where she would be responsible for the safety of others, or open machinery.  She can engage in simple, routine tasks with brief and superficial interaction with coworkers and supervisors, but no contact with the public.  She can have few, if any, workplace changes at a job free of fast-paced production requirements.

5. The claimant has no past relevant work.

6. The claimant was born on April 27, 1961 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  The claimant subsequently changed age category to closely approaching advanced age.

7. The claimant has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 20, 2009, the date the application was filed.

(Tr. 14-22) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

13

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

### A.  The ALJ's Step Three Finding

In relation to the third step of the sequential analysis, Plaintiff argues that the ALJ wrongly concluded that she did not meet or medically equal the listing for affective disorders, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 ("Listing 12.04").  Plaintiff submits that her condition meets Paragraph A of the listing and the ALJ's evaluation of the Paragraph B criteria was not supported by the record.

The third step of the disability evaluation process asks the ALJ to compare the claimant's impairments with an enumerated list of medical conditions found in the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  A claimant will be deemed disabled if his impairments meet or equal one of these listings.  In order to "meet" a listing, the claimant must satisfy all of the listing's requirements.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th

Cir. 2009).  However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled if his impairments "medically equal" the listing in question.  20 C.F.R. §§ 404.1526(b)(3), 416.926(b)(3).  To do so, the claimant must show that his impairments are "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(b)(3).  At this step, it is the claimant's burden to provide evidence showing that she equals or meets the listing.  *Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) (*citing Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).

To establish an affective disorder, Plaintiff must prove, in part, that as a result of her mental condition, she suffers from at least two of the following conditions listed in Paragraph B of Listing 12.04:

1. Marked restrictions of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Sbpt. P, App. 1, § 12.04(B).[2]  The Regulations provide that to establish a marked limitation in any of these areas, a claimant must show that her impairment "seriously interfere[s] with the ability to function independently, appropriately and effectively."  20 C.F.R. § 404, Sbpt. P, App. 1; *Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988).

The ALJ ruled that East did not meet or medically equal the listing because she met none of the B criteria. (Tr. 15-16).  Plaintiff claims that contrary to the ALJ's finding of moderate difficulties, she experienced marked restrictions in two areas: social functioning and

---

[2] As an alternative to meeting two of the four criteria of Paragraph B, an applicant may meet the criteria in Paragraph C of Listing 12.04. Because Plaintiff has not argued that she meets or exceeds the requirements of Paragraph C, the Court has not quoted the same.

concentration, persistence, and pace.  However, the ALJ's finding is supported by substantial evidence of record.  The ALJ considered all of the evidence and reasonably determined that Plaintiff was not markedly impaired in either mental functioning domain.

In regard to social functioning, the ALJ recounted Plaintiff's statements that she had difficulty with authority figures and criticism, and attended two community college courses one-on-one with professors, because of problems with peers. (Tr. 15).  Nevertheless, the ALJ went on to provide reasoning, which is substantially supported, showing that Plaintiff was not markedly limited.  The ALJ observed that East was able to interact with her treating sources and otherwise obtained assistance working through her problems. (*Id.*).  Additionally, the ALJ noted that Plaintiff successfully completed various college courses without one-on-one study, managing interactions with others, at least on a limited basis. (Tr. 21).  Upon Plaintiff's release from prison, Mr. Bealty indicated that Plaintiff would perform well in a field that required customer contacts and interaction, once her confidence in verbal and social skills increased. (*Id.*).

In arguing that the ALJ's finding lacks substantial support, Plaintiff points to complaints she made to healthcare providers in which she described her difficulty getting along with others.  However, the ALJ found that Plaintiff was not fully credible, which Plaintiff does not now contest.  Plaintiff also notes Dr. Litwin stated that her interpersonal skills were poor and social skills undeveloped.  Yet, despite these observations, Dr. Litwin opined that Plaintiff could work, as long as the work setting did not place her around large crowds or interacting with the public, thus indicating that Plaintiff was not so severely limited in her social skills. (Tr. 222).

As to concentration, persistence, and pace, the ALJ found only moderate limitations, due in part, to Plaintiff's ability to concentrate sufficiently to complete her homework for her community college courses. (Tr. 15).  While the ALJ acknowledged that not all of East's grades

were good, and that she withdrew from one course, East also testified that she obtained her GED in prison and obtained many passing grades in college. (Tr. 15, 19).  The ALJ also recounted that while testifying at the hearing, Plaintiff was able to recall incidents from the past and focus on questions to provide responsive and relevant answers. (Tr. 16).

Plaintiff points to various pieces of evidence in an attempt to support a marked limitation. Among such evidence were tests performed by Dr. Litwin that showed a notable decline in Plaintiff's memory.  However, even in light of these results, Dr. Litwin opined that Plaintiff would be suited for low skilled tasks that were simple and repetitive. (Tr. 221). The ALJ also noted that Ms. Bealty found Plaintiff easily absorbed information during her incarceration. (Tr. 21).  Overall, the evidence sufficiently supports the ALJ's finding that Plaintiff was no more than moderately limited in the domain.

Plaintiff points to evidence that may support some level of impairment; however, she has failed to make the showing of marked limitations or point to substantial evidence demonstrating that the ALJ erred by finding she did not meet or medically equal the criteria set forth in Paragraph B of the listing.  While Plaintiff may meet the requirements of Paragraph A of Listings 12.04, there is substantial evidence to support the finding of only moderate limitations under Paragraph B, and therefore, remand on this ground is inappropriate.

### B.  Medical Opinion Evidence

Plaintiff takes issue with the ALJ's treatment of various opinions rendered by medical practitioners who had the opportunity to examine her, including her treating physicians, consultative examiner, and chiropractor.  Plaintiff's allegations of error as to each opinion at issue will be addressed in turn.

### 1.  Treating Physicians

East purports that the ALJ failed to attribute appropriate weight to the opinions of Drs. Altose, Chua, and Gannon, who spoke to the limitations stemming from her mental health impairments.  In her brief, Plaintiff makes the conclusory statement that the ALJ inappropriately granted no weight Dr. Gannon's opinion, but she puts forward no substantive argument setting out the ALJ's purported error with respect to the doctor.  As a result the Court will not consider whether the ALJ erred in her treatment of this medical source, and will restrict its review to Drs. Altose and Chua.

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history.  *Id.*; 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

The treating source's opinions are not entitled to such deference, however, if they are unsupported by the medical data in the record, or are inconsistent with the other substantial evidence in the record.  *See Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL 229979, at *2 (6th Cir. Nov. 7, 1991) (Table).  When the treating physician's opinions are not entitled to controlling weight, the ALJ should apply specific factors to determine how much

weight to give the opinion. *Wilson*, 378 F.3d at 544, *see* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The regulations also advise the ALJ to provide "good reasons" for the weight accorded to the treating source's opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Regardless of how much weight is assigned to the treating physician's opinions, the ALJ retains the power to make the ultimate decision of whether the claimant is disabled. *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)).

### a. Dr. Altose

Plaintiff began attending psychiatric treatment with Dr. Altose on February 11, 2010. (Tr. 438). On March 22, 2010, Dr. Altose completed a Mental Residual Functional Capacity Assessment form after examining East. (Tr. 592-93).

As an initial matter, Plaintiff's course of treatment with Dr. Altose does not seem sufficient to qualify the psychiatrist as a treating source. A physician may be deemed a "treating source" if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (alteration in original) (*quoting* 20 C.F.R. § 404.1502). While a physician seen infrequently may be a treating source, such a finding is only appropriate "if the nature and frequency of the treatment or evaluation is typical for [the] condition." *Id.* Two psychiatric visits, only one month apart, have been found insufficient to establish a treating relationship, as it is not a frequency consistent with the longitudinal nature of psychiatric treatment. *Smith v. Astrue*, No. 4:11-CV-0863, 2012 WL 946852 (N.D. Ohio Mar. 20, 2012); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485 (6th Cir. 2005). Prior to Dr. Altose completing the functional capacity form, Plaintiff presented to the psychiatrist on only

two occasions, one month apart.  Dr. Altose completed the questionnaire at the time of East's second visit.  East's subsequent visits with Dr. Altose are irrelevant in determining whether the residual functional capacity ("RFC") form was that of a treating source at the time it was completed. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) ("The question is whether [the claimant] had the ongoing relationship with [the physician] to qualify as a treating physician at the time he rendered his opinion.")

Even assuming that Dr. Altose qualified as a treating source, the ALJ sufficiently complied with the treating source analysis.  When making the disability determination, the ALJ cited to and discussed Dr. Altose's opinion. (Tr. 20)  The ALJ expressly noted Dr. Altose's assessment that Plaintiff could not work consistently in a peer or social structure.  The ALJ set forth reasonable grounds for her decision to grant "no weight" to Dr. Altose's opinion.  First the ALJ indicated that Dr. Altose spoke to an issue reserved to the Commissioner.  Next, the ALJ asserted that the record demonstrates Plaintiff was able to interact with others, even if on a limited basis, while attending courses at community college, which contradicted Dr. Altose's belief that Plaintiff would could not work consistently with others. (*Id.*).

As to the ALJ's first reason for discounting the doctor, it is well-established that only *medical opinions* issued by treating physicians are entitled to deference. *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) (*citing* 20 C.F.R. §§ 404.1527(d), 416.927(d)).  Opinions on issues reserved to the Commissioner—such as whether the claimant is employable—are not medical opinions, nor deserving of any particular weight. *Id.* (*citing* 20 C.F.R. §§ 404.1527(e), 416.927(e)).  Admittedly, the ALJ should have more thoroughly described Dr. Altose's finding that Plaintiff was unemployable and confronted it directly, but her failure to do so does not undermine the fact that this portion of Dr. Altose's opinion was not

controlling or entitled to deference. The ALJ also noted that evidence in the record contradicted Dr. Altose's statement that it would be "extremely problematic" for Plaintiff to work consistently with peers. (Tr. 20). Namely, the ALJ cited Plaintiff's ability to participate in course work at community college where she interacted with peers, at least on a limited basis, undermining the severity of the limitation Dr. Altose suggested.

Plaintiff argues that the ALJ was required to address the individual marked and moderate limitations Dr. Altose identified on the form. However, Dr. Altose opined that such limitations would last only 9 to 11 months. (Tr. 592). As a result, Dr. Altose's recommendations were insufficient to establish that Plaintiff had limitations that would endure for 12 months or longer necessary to qualify for disability. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The ALJ did not expressly note this deficiency as to Dr. Altose's opinion. Nevertheless, the ALJ also declined to attribute controlling weight to Dr. Chua's opinion, which was issued on an identical mental RFC form, because Dr. Chua opined that the limitations assigned were to last less than 12 months. The ALJ's treatment of Dr. Chua's findings reflects her opinion regarding limitations that fail to meet the durational requirements. Accordingly, reading the ALJ's opinion as a whole provides adequate support for the ALJ's attribution of weight to Dr. Altose.

### b. Dr. Chua

Plaintiff's brief indicates that she first treated with Dr. Chua on March 24, 2011. (Tr. 633). Dr. Chua completed a Mental Functional Capacity Assessment form around the same day. (Tr. 594-95). Given that Dr. Chua personally treated Plaintiff on only one occasion before completing the functional capacity form, her treatment history with Plaintiff would not qualify her opinion to the deference afforded by the treating physician rule.

Even assuming that Dr. Chua was a treating source, the ALJ confronted Dr. Chua's report and provided good reasons for discounting the doctor's opinion. (Tr. 20).[3]  The ALJ noted that Dr. Chua deemed Plaintiff unable to work, a consideration that is reserved to the Commissioner. As to the balance of Dr. Chua's opinion, the ALJ explained that Dr. Chua indicated Plaintiff's mental limitations would last only between 9 and 11 months, which fails to meet the durational requirement to establish disability.  Such analysis sufficiently supported the ALJ's decision to devalue Dr. Chua's opinion.

### 2.  Consultative Examiner

Plaintiff also argues that the ALJ improperly gave "little weight" to the findings of one-time physical examiner Dr. Sioson. (Tr. 19).  Based on Dr. Sioson's opportunity to conduct an examination and the findings from such examination, East asserts that the ALJ should have given the doctor's opinion substantial weight.

Simply because a physician has examined a claimant, does not entitle that physician's opinion to deference.  It is well-settled that the opinions of a one-time examining physician are not entitled to any special level of deference.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (ruling that medical opinion of a physician who examined the plaintiff on one occasion was "entitled to no special degree of deference").  When evaluating opinions issued by a non-treating physician, the Regulations advise the ALJ to consider various factors, including the supportability and consistency of the opinion. 20 C.F.R. § 416.927(c).

Here, the ALJ acknowledges that Dr. Sioson had the chance to perform a consultative examination. (Tr. 19).  Nevertheless, the ALJ awarded little weight to the doctor's opinion that East should be limited to sedentary work, because Plaintiff's walking, standing, sitting, handling, carrying, and lifting would be impaired. (Tr. 19, 362).  Taking into account the supportability

---

[3] The ALJ mistakenly identified Dr. Chua as Dr. "Chin." (Tr. 20).

and consistency factors set forth in the regulations, the ALJ observed that Dr. Sioson's findings did not comport with the results of the physical examination. (*Id.*).  As the ALJ noted, during the examination, Plaintiff was able to walk normally with no assistive device, and she could grasp and manipulate with each hand, despite Dr. Sioson's observations that Plaintiff would be limited in both regards. (Tr. 19, 362).  Additionally, upon physical examination, Plaintiff had no extremity edema, no apparent effusion or instability in her knees, and no deformity in her left ankle, though it had surgical scars.  (Tr. 21, 362).  The ALJ also gave great weight to the opinion of state agency reviewer Dr. Green, who assessed Dr. Sioson's opinion and agreed that the limitation to sedentary work did not conform with Dr. Sioson's physical examination findings. (Tr. 19, 530).  Accordingly, the undersigned finds that the ALJ's treatment of Dr. Sioson is supported by substantial evidence.

### 3.  Other Source Opinion

Finally, Plaintiff maintains that the ALJ improperly discounted the opinion issued by Dr. Rutkowski, her chiropractor.  Social Security Ruling ("SSR") 06-03p explains how the Commissioner should address opinions from sources who are not "acceptable medical sources," but rather, are deemed "other sources." SSR 06-3p, 2006 WL 2329939, at *1.  Among these other sources are chiropractors. *Id.* at *1-2.  Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function. *Id.*; *see Cruse v. Comm'r Soc. Sec.*, 502 F.3d 532 (6th Cir. 2007). Additionally, SSR 06-3p states:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the

23

adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6.  The Ruling also sets out factors to be considered when evaluating opinion evidence from medical sources that are not acceptable medical sources. *Id.* at *4-5. These factors include: how long the source has known the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, and how well the source explains the opinion. *Id.*

In the present case, the ALJ expressly considered the physical RFC opinion issued by Mr. Rutkowski, which purported that Plaintiff was capable of less than sedentary work. (Tr. 20).  The ALJ provided two grounds for assigning "no weight" to the opinion. First, the ALJ noted that Mr. Rutkowski was not an acceptable medical source.  But the ALJ did not limit her reasoning to this fact alone.  She also observed that Mr. Rutkowski's opinion was not well supported or explained.  More specifically, the ALJ observed that the chiropractor provided little definite support for his opinions other than generalizations and conclusory statements that Plaintiff exhibited "signs, symptoms, AROM, history, swelling, and spasms." (*Id.*).

The ALJ's treatment of Mr. Rutkowski is substantially supported. Although Mr. Rutkowski broadly noted that Plaintiff had general symptoms, given the nature and seriousness of the limitations he assigned, further and more specific elaboration to support his opinion was warranted. (Tr. 609).  For example, the chiropractor provided no specific reason to support his suggestion that Plaintiff could sit for no more than one hour during an eight hour workday. (*Id.*). Nor did he provide adequate justification for finding Plaintiff to be incapable of handling, fine manipulation, or gross manipulation. (Tr. 610).  Furthermore, such extreme limitations as found

24

by Mr. Rutkowski do not seem to have been endorsed by other medical sources in the record. Accordingly, Plaintiff's allegation of error lacks merit.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  August 4, 2014.